UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
RHONDA P. LEY, Regional Director of the :
Third Region of the National Labor Relations :
Board, for and on behalf of the NATIONAL : **OPINION AND ORDER**
LABOR RELATIONS BOARD, :
                          Petitioner, : 15 CV 3982 (VB)
                                       :
v.                                     :
                                       :
WINGATE OF DUTCHESS, INC.,             :
                          Respondent.  :
-------------------------------------------------------------x

Briccetti, J.:

     Rhonda P. Ley, Regional Director for Region 3 of the National Labor Relations Board

("Petitioner"), brings this action against respondent Wingate of Dutchess, Inc. ("Respondent"),

pursuant to Section 10(j) of the National Labor Relations Act ("NLRA"), seeking a temporary

injunction pending the final administrative disposition by the National Labor Relations Board

("Board").  (Doc. #47).

     Petitioner seeks (i) an interim bargaining order, (ii) interim reinstatement of a terminated

union activist, and (iii) an order requiring Respondent to read the Court's order to its employees.

     For the reasons set forth below, the petition is GRANTED.

     The Court has jurisdiction pursuant to Section 10(j) of the NLRA.  29 U.S.C. § 160(j).

## BACKGROUND

### I.    Procedural History

     On October 1, 2014, 1199 SEIU United Healthcare Workers East (the "Union") filed a

petition to hold an election for union representation at Wingate of Dutchess, a nursing home in

Fishkill, New York.  On November 10, 2014, the Union filed with the Board an unfair labor

practice charge alleging Respondent was engaging in unfair labor practices under Section 8(a)(1)

and (3) of the NLRA.  An election was held among eligible employees on November 12, 2014,

and the Union received 60 votes, with 64 employees voting against the Union.  The Union

amended its unfair labor practice charge in December 2014, and again in January 2015.  In

February 2015, the Union filed a new charge alleging Respondent was engaging in unfair labor

practices.  On March 31, 2015, the General Counsel of the Board consolidated the cases.  On

April 17, 2015, the General Counsel issued an amended consolidated complaint, and Respondent

timely answered.

On May 22, 2015, Petitioner filed a petition for an injunction under Section 10(j) of the

NLRA with this Court.  (Doc. #1).  Following a conference on May 29, 2015, the Court declined

to grant the requested injunctive relief, pending the result of the administrative proceeding before

the Board's Administrative Law Judge.  (Doc. #30).[1]

In June 2015, the case was tried before Administrative Law Judge Mark Carissimi

("ALJ").  On November 16, 2015, the ALJ issued a decision ("ALJ Decision") on the allegations

of the amended consolidated complaint, largely finding in favor of the Union.  On December 2,

2015, this Court held a conference and directed Petitioner to file an amended petition for an

injunction under Section 10(j) of the NLRA.  (Doc. #44).

II.    Alleged Unfair Labor Practices

The following facts are taken from the amended petition (Doc. #47), Petitioner's

memorandum of points and authorities in support of its petition (Doc. #47-2), Respondent's

memorandum of law in opposition (Doc. #48), Petitioner's reply brief in support of its amended

petition (Doc. #52), ALJ Carissimi's November 16, 2015, decision (Doc. #39-1), and the

---

[1]    The Court's June 1, 2015, Order did not deny the injunctive relief, but instead left the
petition pending, in large part because the parties were scheduled to try the case before an ALJ
beginning two weeks later.  (Doc. #30).

declarations and exhibits submitted in conjunction therewith.

    A.    <u>Unfair Labor Practices Regarding the Unionization Campaign</u>

Respondent's nursing home employs approximately 160 people and provides care for approximately 160 residents.

Respondent's owner, Wingate Healthcare Inc., also owns 18 other nursing facilities.  In June 2014, the Union filed a petition for an election on behalf of certified nursing aides ("CNAs") and licensed practical nurses ("LPNs"), and unit aides at one of Respondent's sister facilities, Wingate of Ulster.

Clayton Harbby, the administrator of Wingate of Dutchess, was instructed by Wingate Healthcare Inc.'s senior personnel to monitor the presence of union representatives or activity on Respondent's property.  During the week of July 7, 2014, Harbby asked some employees at Wingate of Dutchess, including a CNA named Georgann Allen, to go to the Ulster facility to share their experiences at the Dutchess facility and express the view that Wingate of Ulster did not need to unionize.[2]  Allen did not agree to Harbby's request because she felt the employees at the Dutchess facility were "in the same boat as the people at Ulster."  (ALJ Decision at 6).

After the meeting with Harbby, Allen reported Harbby's request to four colleagues.  They began discussing certain points of dissatisfaction with Wingate, including their inability to afford health insurance and lack of job security.  One employee, Sandra Stewart, asked Allen what they could do about these problems, to which Allen replied that she could contact the Union.

Two days later, Stewart reached out to the Union.  Stewart and a Union representative discussed unionizing and the representative asked Stewart to circulate a list to employees to

---

[2]    The ALJ found that by requesting Allen to speak in support of Wingate during the Ulster facility's unionization campaign, "Respondent placed Allen in [a] position of declaring her union sympathies in violation of Section 8(a)(1) of the [NLRA]."  (ALJ Decision at 11).

apply for the Union to represent them.  Stewart obtained approximately 35 signatures and faxed it to the Union.

At some point during the week after Harbby's meeting with Allen, the director of nursing services, Ann Nelson, approached Allen about whether she would speak at the Ulster facility. Nelson apparently thought Allen had agreed to speak at Ulster, and Allen reiterated she felt the employees at the Dutchess facility "were in the same boat" as the employees at the Ulster facility, and accordingly, she would not speak to them.  (ALJ Decision at 7).[3]

On July 14, 2014, Respondent posted a memo from Nelson to the nursing staff indicating it would introduce bonuses for perfect attendance for the period from July 18, 2014, through September 18, 2014.[4]

On July 23, 2014, Harbby and Nelson held a series of meetings with employees.  Harbby told employees that Wingate at Dutchess did not need a union and predicted there would be layoffs and cutbacks due to the union election at the Ulster facility.  Harbby informed the employees he would "stay at [a] hotel and sleep night and day to make sure that there was no union coming into his facility."  (ALJ Decision at 8).[5]  He also announced Wingate at Dutchess

---

[3]     The ALJ found that Nelson's questioning of Allen about whether she was going to speak at the Ulster facility violated Section 8(a)(1) of the NLRA because Nelson's position, as the highest ranking manager on Respondent's nursing staff, supported a finding that the question was coercive.  (ALJ Decision at 12).

[4]     Because the ALJ found the Respondent suspected union activity was being conducted at the Dutchess facility and did not establish that the offer of an attendance bonus was made pursuant to an established practice, the ALJ concluded Respondent violated Section 8(a)(3) and (1) of the NLRA by announcing and implementing the bonus attendance program.  (ALJ Decision at 26-27).

[5]     The ALJ found that Harbby's statements violated Section 8(a)(1) of the NLRA because they suggest that efforts to obtain union representation would be futile, and therefore "may be reasonably expected to chill employees' rights to exercise their Section 7 rights to organize." (ALJ Decision at 11-12).  The ALJ also found that Harbby's questioning of the employees at

would change its practice of issuing paychecks every two weeks to its previous practice of paying employees on a weekly basis.[6]

On July 25, 2014, a Union representative met with Allen and Stewart to discuss the organizing process.  The Union representative gave them authorization cards and explained that if a majority of employees signed the cards in support of the Union, the Union would be able to bargain a contract with Respondent.  Stewart then began soliciting employees to sign the cards in support of the Union.

In late July 2014, Nelson and Harbby instructed Stewart not to conduct union activities while employees were engaged in patient care.  Nelson had received reports that Stewart was soliciting authorization card signatures while employees were in patients' rooms or passing out medications.  Harbby told Stewart she should educate herself to know what she was getting into.[7]

Beginning on August 8 and continuing through the November 12, 2014, election, union representatives and employee supporters occasionally gathered at a parking lot of a property adjacent to the Dutchess facility during shift changes to demonstrate support for the union.  On August 8, 13, and 20, managers or supervisors confronted the employees about accessing the facility's property, requested the employees move, and when they did not, called the police.

---

these meetings was coercive and violated the same section of the NLRA.  (ALJ Decision at 13).

[6]   The change in payroll was instituted on August 8, 2014.  Because there was evidence that employees were dissatisfied with the biweekly payroll period, and that Respondent knew of the dissatisfaction, the ALJ held this change in payroll policy was a grant of a benefit in violation of Section 8(a)(3) and (1) of the NLRA.  (ALJ Decision at 27-28).

[7]   The ALJ found that Harbby's statements constitute "a threat of unspecified reprisals for engaging in union activity" in violation of Section 8(a)(1) of the NLRA.  (ALJ Decision at 14).

Each time the employees either left or complied with the police officers' instructions.[8]

By August 13, the Union had obtained authorization cards from 70 of the 139 eligible employee voters. By the end of August, the Union had obtained authorization cards from 87 of the 139 eligible employee voters.

On August 22, 2014, Respondent posted a memo from the owner and president of Wingate Healthcare Inc. to employees at the Dutchess facility. The memo announced a 2% wage increase for employees in good standing who had been hired prior to January 1, 2014. Prior to this announcement, Respondent's practice was to grant wage increases to employees on their anniversary dates, subject to a favorable review. The wage increase was implemented on September 1, 2014.[9]

On September 17, Harbby approached Union representatives and Stewart, who were outside the facility demonstrating support for the Union. Harbby told them to get off of his property, but a Union representative informed him the supporters were standing where the police told them they could stand. Harbby began asking Stewart why she would want to bring the

---

[8]    The ALJ found that Respondent violated Section 8(a)(1) of the NLRA by calling the police to remove the union representatives and employees supporters from the parking lot of the adjacent property because Respondent did not have a right to exclude supporters from demonstrating in the parking lot or on the side of the street. (ALJ Decision at 20). When certain of Respondent's supervisors questioned or took pictures of the employee supporters, the ALJ found those actions constituted "unlawful interrogation" or "unlawful surveillance," respectively, in violation of Section 8(a)(1) of the NLRA. (ALJ Decision at 21).

[9]    During the ALJ hearing, Respondent argued its decision to grant a wage increase was underway before the onset of union activity and was based on a lawful desire to bring its wages in line with competitors, but the ALJ found these contentions unsupported by the record. The ALJ held Respondent did not establish the 2% wage increase "during a union organizing campaign at Dutchess was governed by factors other than the pending union campaign" and accordingly, the announcement and implementation of the wage increase violated Section 8(a)(3) and (1) of the NLRA. (ALJ Decision at 33-36).

Union to Wingate at Dutchess.[10]

By October 11, the Union had obtained 96 signed authorization cards out of a total of 139 eligible employees.

On or about November 6, 2014, six days before the election, Respondent posted a memo entitled "Straight Talk."  The memo posed questions to employees about the benefits they received as non-union employees.  For example, the memo asked, "[a]re you willing to trade away your Wingate union free flexibility for representation by 1199?"  (ALJ Decision at 38).[11]

On November 11, the day before the election, Respondent sent a text message to all employees, stating "Free jeans day tomorrow Wednesday 11/12 if you wear your Wingate proud shirt!"  (ALJ Decision at 43).[12]

The election was held on November 12, 2014 and the employees voted against the Union, 64 to 60.

B.    Unfair Labor Practices Regarding Sandra Stewart

Stewart was a CNA at Wingate of Dutchess beginning in 2009.  Her annual evaluations were within the outstanding or excellent ranges, although she had been disciplined with warnings twice over her five years.

---

[10]    The ALJ found that Harbby's questions and comments to Stewart "reflected the view that support for the Union is not compatible with employment with the Respondent," and were "implied threats of discharge for engaging in union activity" in violation of Section 8(a)(1) of the NLRA.  (ALJ Decision at 22).

[11]    The ALJ found "Respondent threatened employees with a loss of existing benefits if they selected the Union as their representative in violation of Section 8(a)(1) of the Act."  (ALJ Decision at 39).

[12]    The ALJ found if employees did not wear "Wingate proud" shirts on the day of the election, they would be viewed as supporting the Union, and therefore employees were pressured to make an "'observable choice' on the day of the election that demonstrated their support for or rejection of the Union" in violation of Section 8(a)(1) of the NLRA.  (ALJ Decision at 43).

As described above, Stewart initially contacted the Union in mid-July 2014, met with Union representatives about engaging employee support for the Union, and was the principal advocate for the Union.  Of the 97 signed authorization cards, she solicited 56 employee signatures.  Respondent became aware of Stewart's support for the Union as early as July 29, 2014, when Nelson and Harbby spoke to her about soliciting authorization cards during working hours.

On September 20, 2014, the daughter of one of the facility's residents complained to Nelson that Stewart had refused to assist her father use the toilet and left the resident wet with urine.  Nelson investigated the incident, including soliciting written statements from the resident's daughter and the other staff members assigned to the resident's unit during the shift. Stewart spoke to Nelson and denied that she failed to assist the resident.  Stewart refused to make a written statement because she believed Nelson was harassing her for her union activity.  Based on the investigation, Nelson concluded Stewart was lying and the resident had not been assisted in using the toilet.  Nelson placed Stewart on a performance improvement plan.[13]

On October 3, 2014, the resident's daughter brought two new complaints about the care her father was receiving.  First, the daughter complained that her father had told her an aide had called her father "the great reporter."  Second, the daughter complained her father's face had a lot of nicks from being shaved.

That same day, Nelson began investigating the incident by speaking with the resident and

---

[13]     Although the complaint did not contain any allegations regarding the alleged failure of Stewart to assist the resident on September 20, the ALJ assessed the credibility of the various witnesses about this incident because it was necessary to consider whether Respondent had a reasonable basis to believe Stewart failed to deliver appropriate care, which would justify taking an adverse employment action.  The ALJ concluded "Nelson did not have a reasonable basis to believe that Stewart had not delivered appropriate care" to the resident.  (ALJ Decision at 51).

her daughter.  The resident could not identify Stewart by name but described the aide in question as Puerto Rican.[14]  The resident told a facility social worker that the "great reporter" comment had occurred a few days ago, although he had earlier told Nelson it occurred that morning.

Later that day, Nelson submitted an incident report to the New York State Department of Health and identified Stewart as the employee under investigation for abusing the resident. Nelson removed Stewart from Respondent's schedule pending the investigation.

Stewart gave written and verbal statements indicating she had not referred to the resident as the "great reporter" or "news reporter," and that, although she had shaved the resident that day, he had not complained.

Based on her investigation, Nelson concluded Stewart did refer to the resident as the "great reporter" while administering care to him, directly as a result of the toilet incident on September 20.  Nelson determined Stewart's actions warranted discharge.  In the Termination Summary Report, the reason for the discharge stated, "Sandra failed to provide care to the resident and when this was reported she retaliated and called a resident 'The Reporter' which is reprisal."  (ALJ Decision at 56).  The Vice President of Human Resources approved Nelson's recommendation to terminate Stewart and on October 17, Harbby informed Stewart she was terminated for resident abuse.[15]

## DISCUSSION

I.    Legal Standards

Pursuant to Section 10(j) of the NLRA, the Board "shall have power, upon issuance of a

---

14      Stewart is Jamaican.
15      The ALJ held Respondent did not meet its burden during the administrative hearing to establish that it would have discharged Stewart if she had not engaged union activity, and therefore Stewart's suspension and discharge violated Section 8(a)(3) and (1) of the NLRA. (ALJ Decision at 64).

complaint . . . charging that any person has engaged in or is engaging in an unfair labor practice, to petition any United States district court . . . for appropriate temporary relief or restraining order . . . and [the court] shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper."  29 U.S.C. § 160(j).

The Second Circuit applies a two-prong test for Section 10(j) injunctions.  Kreisberg v. HealthBridge Mgmt., LLC, 732 F.3d 131, 141 (2d Cir. 2013).  "First, the court must find reasonable cause to believe that unfair labor practices have been committed.  Second, the court must find that the requested relief is just and proper."  Id. (quoting Hoffman ex rel. NLRB v. Inn Credible Caterers, Ltd., 247 F.3d 360, 364-65 (2d Cir. 2001)).

A.    Reasonable Cause

When considering whether a petitioner has demonstrated reasonable cause to believe unfair labor practices have been committed, the Court need not "make a final determination whether the conduct in question constitutes an unfair labor practice."  Hoffman ex rel. N.L.R.B. v. Inn Credible Caterers, Ltd., 247 F.3d at 365.

The Court gives "significant deference" to the Board's Regional Director's determinations.  Paulsen v. Remington Lodging & Hosp., LLC, 773 F.3d 462, 469 (2d Cir. 2014).  "[A] district court should decline to grant relief only if convinced that the NLRB's legal or factual theories are fatally flawed."  Silverman v. Major League Baseball Player Relations Comm., Inc., 67 F.3d 1054, 1059 (2d Cir. 1995).  Therefore, when disputes arise as to issues of fact, the Regional Director's "version of the facts should be sustained if within the range of rationality."  Kaynard v. Mego Corp., 633 F.2d 1026, 1031 (2d Cir. 1980).  "[E]ven on issues of law, the district court should be hospitable to the views of" the Regional Director, "however novel."  Id.  (citation and quotations omitted).

10

When an administrative law judge has ruled on a petition, the judge's findings may serve as a point of reference for the district court.  See Hoffman ex rel. N.L.R.B. v. Inn Credible Caterers, Ltd., 247 F.3d at 367; Silverman v. J.R.L. Food Corp., 196 F.3d 334, 337 (2d Cir. 1999); Seeler v. Trading Port, Inc., 517 F.2d 33, 37 (2d Cir. 1975).

B.    Just and Proper

Injunctive relief is "just and proper" under Section 10(j) "when it is necessary to prevent irreparable harm or to preserve the status quo."  Kreisberg v. HealthBridge Mgmt., LLC, 732 F.3d at 141 (quoting Hoffman ex rel. N.L.R.B. v. Inn Credible Caterers, Ltd., 247 F.3d at 365).

Preservation of the status quo serves "to protect employees' statutory collective bargaining rights."  Hoffman ex rel. N.L.R.B. v. Inn Credible Caterers, Ltd., 247 F.3d at 368 (2d Cir. 2001).  "However, the status quo which deserves protection under [Section] 10(j) is not the illegal status quo which has come into being as a result of the unfair labor practices being litigated . . . .  Instead, [S]ection 10(j) was intended as a means of preserving or restoring the status quo as it existed before the onset of unfair labor practices."  Seeler v. Trading Port, Inc., 517 F.2d at 38.

In evaluating irreparable harm, "district courts consider whether the employees' collective bargaining rights may be undermined by the alleged unfair labor practices and whether any further delay may impair or undermine such bargaining in the future."  Fernbach ex rel. N.L.R.B. v. Sprain Brook Manor Rehab, LLC, 91 F. Supp. 3d 531, 540 (S.D.N.Y. 2015) (quotations and alterations omitted).

II.    Reasonable Cause

Petitioner has alleged Respondent violated Section 8(a)(1) and Section 8(a)(3) of the NLRA.  To succeed on the first prong of the Section 10(j) inquiry, Petitioner must demonstrate

there is reasonable cause to believe Respondent violated these sections of the NLRA.  The Court

addresses each section in turn, giving "significant deference" to the Regional Director's version

of the facts.  Paulsen v. Remington Lodging & Hosp., LLC, 773 F.3d at 469.

    A.      Section 8(a)(1) of the NLRA

Section 8(a)(1) of the NLRA provides that "[i]t shall be an unfair labor practice for an

employer to interfere with, restrain, or coerce employees in the exercise of the right" to "self-

organization, to form, join, or assist labor organizations, to bargain collectively through

representatives of their own choosing, and to engage in other concerted activities for the purpose

of collective bargaining."  29 U.S.C. §§ 157, 158(a)(1).

Respondent argues there is no reasonable cause to believe it engaged in unfair labor

practices in violation of Section 8(a)(1).[16]

The Court disagrees.

Based on the above facts, the Court finds there is reasonable cause to believe Respondent

violated Section 8(a)(1) of the NLRA because it, through Harbby, Nelson, or other supervisors,

(i) placed employees in a position of declaring their union sympathies; (ii) coercively questioned

certain employees about their support for the union; (iii) implicitly threatened reprisal for

engaging in union activity; (iv) excluded employees supporting the union from property from

---

[16]    Respondent recognizes the reasonable cause analysis is a deferential standard, but argues this Court should "not abdicate review of these issues, particularly as it is very unlikely a Circuit Court will uphold those findings."  (Respondent Br. at 30).  To support this proposition, Respondent cites decisions from the Courts of Appeals for the Third, Fourth, and Sixth Circuits, and criticizes the ALJ's factual findings and credibility determinations.

    However, the Court follows the law of this Circuit and sustains the Regional Director's version of the facts when, as here, those "facts are within the range of rationality."  Kaynard v. Mego Corp., 633 F.2d at 1031.  Moreover, the Court will not engage in a line-by-line fact- or credibility-check of ALJ's decision, given the Court need not reach "a final determination the conduct in question constitutes an unfair labor practice."  Hoffman ex rel. N.L.R.B. v. Inn Credible Caterers, Ltd., 247 F.3d at 365.

which Respondent did not have a right to exclude supporters; (v) unlawfully surveilled employees supporting the union; and (vi) pressured employees to demonstrate their support for or rejection of the union in an observable way.

      B.      <u>Section 8(a)(3) of the NLRA</u>

Section 8(a)(3) of the NLRA provides that "[i]t shall be an unfair labor practice for an employer . . . by discrimination in regard to hire or tenure of employment or any term or condition of employment[,] to encourage or discourage membership in any labor organization." 29 U.S.C. § 158(a)(3).

Respondent argues there is no reasonable cause to believe it engaged in unfair labor practices in violation of Section 8(a)(3) because its actions were made pursuant to established practices and not due to the pending union campaign.

The Court disagrees.

The Court finds there is reasonable cause to believe Respondent violated Section 8(a)(3) of the NLRA because, as set forth above, it (i) announced and implemented a bonus attendance program; (ii) changed the payroll period from biweekly to weekly in response to employee dissatisfaction; (iii) announced and implemented a wage increase; and (iv) suspended and then discharged Sandra Stewart.  The foregoing acts occurred in the weeks leading up to the election and Respondent failed to show these actions were governed by factors other than the pending union campaign, such that Petitioner's "factual theories [were] fatally flawed."  <u>Silverman v. Major League Baseball Player Relations Comm., Inc.</u>, 67 F.3d at 1059.

III.    <u>Just and Proper</u>

Having found reasonable cause to believe Respondent committed unfair labor practices in violation of the NLRA, the Court now turns to whether the relief Petitioner seeks is just and

13

proper.  Petitioner asks the Court to enter an interim bargaining order and offer interim

reinstatement to Sandra Stewart.

      A.    <u>Interim Bargaining Order</u>

Although a bargaining order is a serious measure, the Court finds an interim bargaining

order is necessary to restore the status quo before Respondent engaged in its unfair labor

practices.

When, as here, the Regional Director has shown the union had a "clear majority" of

support "based on authorization cards," and then the employer engaged in "egregious and

coercive unfair labor practices as to make a fair election virtually impossible, the district court

<u>should</u> issue a bargaining order."  <u>Murphy ex rel. N.L.R.B. v. Hogan Trans., Inc.</u>, 581 F. App'x

36, 37 (2d Cir. 2014) (summary order) (quoting <u>Seeler v. Trading Port, Inc.</u>, 517 F.2d at 40).

Two of Respondent's unfair labor practices are so-called "hallmark violations" – the

granting of benefits to employees, and the demotion or discharge of a union supporter.[17]  <u>See</u>

<u>N.L.R.B. v. Jamaica Towing, Inc.</u>, 632 F.2d 208, 212 (2d Cir. 1980).  Hallmark violations are

unfair labor practices that are so highly coercive "their presence will support the issuance of a

bargaining order unless some significant mitigating circumstance exists."  <u>Id</u>.  Mitigating factors

that must be examined include the specific nature of the misconduct or the passage of time.  <u>See</u>

<u>Murphy ex rel. N.L.R.B. v. Hogan Trans., Inc.</u>, 581 F. App'x at 37-38.

Respondent argues an interim bargaining order is not just and proper because it would

---

[17]      In <u>Hogan Transports</u>, the district court found reasonable cause to believe the employer engaged in three hallmark violations, two of which are the same hallmark violations in the instant case.  <u>Murphy ex rel. N.L.R.B. v. Hogan Trans., Inc.</u>, 581 F. App'x at 37.  Although the district court denied the petitioner's request for an interim bargaining order, the Second Circuit vacated the decision, noting the district court had found "several highly coercive unfair labor practices."  <u>Id</u>.  On remand, the district court granted an interim bargaining order and the Second Circuit affirmed.  <u>Murphy ex rel. N.L.R.B. v. Hogan Trans., Inc.</u>, 607 F. App'x 70, 71 (2d Cir. 2015) (summary order).

alter the status quo by imposing the Union despite the election results, and because mitigating circumstances render an interim bargaining order inappropriate.

The Court is not persuaded.

First, an interim bargaining order would not alter the status quo, as Respondent contends, because the loss of support for a union <u>after</u> an employer's unfair labor practices is no defense to an interim bargaining order.  See <u>Hoffman ex rel. N.L.R.B. v. Inn Credible Caterers, Ltd.</u>, 247 F.3d at 369.  Here, the Union had obtained a majority of employees' signatures on its authorization cards by August 13, 2014.  Nine days later, Respondent announced the 2% wage increase.  The following month, Respondent's administrator, Harbby, made implied threats of discharge to a union supporter for engaging in union activity, and ultimately terminated a key union supporter.  By the time of the election on November 12, 2014, only 60 employees voted for the union.  The status quo that must be restored is the one reflected by the authorization cards before these unfair labor practices occurred.[18]  See <u>Seeler v. Trading Port, Inc.</u>, 517 F.2d at 40. Without an interim bargaining order, Respondent would continue to benefit from its violations of Section 8(a)(1) and (3) of the NLRA.  See, e.g., <u>Fernbach ex rel. N.L.R.B. v. Sprain Brook Manor Rehab, LLC</u>, 91 F. Supp. 3d at 547.

Second, Respondent's argument that mitigating circumstances, such as employee turnover and the passage of time, undermine the appropriateness an interim bargaining order is unavailing.

---

[18]     Petitioner further argues "[t]he Union was neither the bargaining agent nor did it have a majority showing of interest before the purported [unfair labor practices] allegedly began to occur in late July 2014." (Respondent's Br. at 17).  In essence, Respondent asks the Court to restore the status quo before the union obtained a majority of authorization cards.  Respondent's reasoning would render Section 10(j) ineffectual.  Employers could simply quash union support with unfair labor practices at the first hint of union support, and then rely on Section 10(j) to undo subsequent employee support for a union by restoring the status quo to the pre-majority status quo.

Respondent cites several cases in which courts analyzed employee turnover as a mitigating circumstance in deciding against issuing a bargaining order.  Applying those cases here, Respondent argues an interim bargaining order would not be just and proper because 44 of the 139 employees eligible to vote in the election no longer work at Wingate of Dutchess. However, Respondent has cited no support for the proposition that employee turnover is a mitigating circumstance in deciding whether to issue an <u>interim</u> bargaining order.  Each of the cases cited by Respondent involved the issuance of a <u>final</u> bargaining order.[19]  That distinction is important because an interim bargaining order is not permanent.  An interim bargaining order <u>temporarily</u> restores the status quo to preserve the Board's ability to issue an effective remedy at the conclusion of the administrative proceedings.  To consider employee turnover now, in an interim context, may allow Respondent to continue to benefit from its unfair labor practices and erode the Board's ability to remedy the harm caused by Respondent's unfair labor practices once the administrative proceedings have concluded.

Accordingly, because the Court is unaware of any valid support for the proposition that it must consider employee turnover in issuing an interim bargaining order, the turnover at Wingate of Dutchess does not undermine the justness or propriety of the relief sought here.

As for the passage of time, while this could be a valid mitigating circumstance, it is insufficient, without more, to justify rejecting a Section 10(j) petition.  <u>See Paulsen v. Remington</u>

---

[19]     The Court notes that Respondent did cite one unpublished case in which a district court referenced turnover in deciding whether to issue an interim bargaining order, but while its appeal was pending that case was vacated pursuant to a settlement.  <u>Mattina v. Duane Reade, Inc.</u>, 2005 WL 1349855, at *1 (S.D.N.Y. June 8, 2005), <u>vacated pursuant to settlement</u> (Oct. 12, 2006). Moreover, to justify its consideration of employee turnover, the court in <u>Mattina</u> relied upon Second Circuit decisions in non-Section 10(j) cases.  <u>See</u>, <u>e.g.</u>, <u>N.L.R.B. v. Knogo Corp.</u>, 727 F.2d 55 (2d Cir. 1984); <u>N.L.R.B. v. Marion Rohr Corp.</u>, 714 F.2d 228 (2d Cir. 1983). Accordingly, the precedential value of <u>Mattina</u> is extremely weak, especially in light of the dearth of authority suggesting employee turnover must be considered with respect to interim bargaining orders.

Lodging & Hosp., LLC, 773 F.3d at 471.  Respondent must instead show how "delays in commencing, processing and deciding this case have rendered the interim bargaining order inappropriate."  Kaynard v. MMIC, Inc. 734 F.2d 950, 954 (2d Cir. 1984).

Here, Respondent has not shown so much time has passed since the violations occurred that an interim bargaining order requested by Petitioner could not effectively restore the status quo.  While the seventeen months that have passed since the election may be longer than desirable, the time required for the Regional Director's investigation and the ALJ's deliberation were not unreasonable.  The Regional Director's investigation into the unfair labor practices occurred over several months between November 2014 and the filing of the petition in May 2015.  Then, Respondent itself urged the Court to defer ruling on the injunction until after the ALJ's decision.  Next, the ALJ took five months between June and November 2015 to try the case and issue his decision.  Even assuming these delays are unreasonable and caused by Petitioner – which they are clearly not – it would be inappropriate to punish Respondent's employees for such delays.  Fernbach ex rel. N.L.R.B. v. Sprain Brook Manor Rehab, LLC, 91 F. Supp. 3d at 546 (citation omitted).

Thus, while the passage of time in this case may be longer than desirable, because Respondent has not made the requisite showing how the delay undermines the effectiveness of the injunctive relief, an interim bargaining order is just and proper.[20]

B.      Interim Reinstatement of Sandra Stewart

Petitioner also seeks an order directing Respondent to offer reinstatement to the

---

[20]      The Court has considered Respondent's remaining arguments as to why an interim bargaining order would not be just and proper in this case, including that it would cause irreparable harm to employees and Respondent, and finds them without merit.  Respondent's contentions seemingly ignore the temporary nature of the injunctive relief sought and granted herein.

discharged employee, Sandra Stewart.  Interim reinstatement for unlawfully discharged employees is often granted under Section 10(j) relief to restore the status quo and to prevent an "adverse impact on employee interest in unionization."  See, e.g., Kaynard for & on Behalf of N.L.R.B. v. Palby Lingerie, Inc., 625 F.2d 1047, 1053 (2d Cir. 1980).

Therefore, an offer of reinstatement to Ms. Stewart is necessary to reestablish the status quo as it existed before the unfair labor practices occurred and "reassure" Respondent's employees that their "rights are not illusory."  Fernbach ex rel. N.L.R.B. v. Raz Dairy, Inc., 881 F. Supp. 2d 452, 467 (S.D.N.Y. 2012).

## CONCLUSION

For the reasons stated above, the petition for a temporary injunction pursuant to Section 10(j) of the NLRA is GRANTED.  The Court finds there is reasonable cause to believe Respondent engaged in serious unfair labor practices in violations of Sections 8(a)(1) and (3) of the NLRA, and that injunctive relief is just and proper.

Accordingly, it is hereby ORDERED that:

1.  Respondent and its officers, representatives, agents, servants, employees, attorneys, successors and assigns, and all persons acting in concert or participation with them, pending final disposition of the matters involved herein pending before the Board, are enjoined and restrained from:

    (a) Terminating or suspending employees in retaliation for their Union activity.

    (b) Granting employees a wage increase in order to discourage their support for the Union.

    (c) Granting employees an attendance bonus and a more desirable pay period in order to discourage their support for the Union.

(d) Threatening employees by stating selection of the Union would be an act of futility because Respondent would not sign a collective-bargaining agreement.

(e) Threatening employees by stating Respondent would sleep in the facility before allowing the Union representation rights.

(f) Threatening employees with a loss of per-diem hours if they selected the Union as their bargaining representative.

(g) Engaging in surveillance of the union activities of its employees.

(h) Calling the police in order to interfere with the union activities of its employees.

(i) Recruiting employees to campaign against the Union.

(j) Encouraging employees to make an observable choice as to their support for Respondent.

(k) Suggesting to employees that union representation is not compatible with continued employment.

(l) Interrogating employees about their union membership, activities, and sympathies.

(m) Telling employees that union activity is incompatible with their employment.

(n) Telling employees that they are being harassed or to expect to be harassed because of their union activity.

(o) Refusing to recognize and bargain in good faith with 1199 SEIU United Healthcare Workers East, the Union, as the bargaining representative of the employees in the appropriate bargaining unit set forth below:

   a. **Included**: All full-time, regular part-time, and per diem certified nursing aides, licensed practical nurses, unit aides and unit secretaries employed

by Respondent at its Fishkill, New York, facility.

    b. **Excluded**: guards, confidential employees, professional employees and supervisors as defined in the National Labor Relations Act, and all other employees.

(p) In any other manner interfering with, restraining or coercing its employees in the exercise of their Section 7 rights.

2. Respondent, its officers, representatives, agents, servants, employees, attorneys, successors and assigns, and all persons acting in concert or participation with them, pending final disposition of the matters involved herein pending before the Board shall:

(a) Recognize and bargain in good faith with the Union as the exclusive collective-bargaining representative of its employees in the appropriate unit described above.

(b) Within seven (7) days of the entry of this Court's Order, offer Sandra Stewart interim reinstatement to her former position with her seniority and all other rights and privileges, displacing, if necessary, any worker hired to replace her, or if her position no longer exists, to another substantially equivalent position.

(c) Within seven (7) days of the entry of this Court's Order, rescind the suspension issued to Sandra Stewart, and not rely on that suspension when issuing any future discipline.

(d) Post copies of this Court's Order at the Respondent's Fishkill, New York, facility where notices to employees are customarily posted, these postings to be maintained during the pendency of the Board's administrative proceedings free

from all obstructions and defacements; such that all unit employees shall have free and unrestricted access to said notices.

(e) Grant to agents of the Board reasonable access to Respondent's Fishkill, New York, facility in order to monitor compliance with this posting requirement.

(f) Within fourteen (14) days of the entry of this Court's Order, convene the bargaining unit employees during working time at mandatory meeting(s) at the Respondent's Fishkill, New York, facility, whereupon Clayton Harbby or Scott Schuster, in the presence of a Board Agent, will read this Court's Order to employees, or at Respondent's option, have a Board Agent read the Order to bargaining unit employees in Clayton Harbby's or Scott Schuster's presence.

(g) Within twenty-one (21) days of the entry of this Court's Order, file with the Court and submit a copy to the Regional Director of Region Three of the Board, a sworn affidavit from a responsible official of Respondent setting forth, with specificity, the manner in which Respondent has complied with the terms of this decree, including how it has posted the documents required by the Court's decree.

The petition having been granted, the Clerk is instructed to close this case.

Dated: April 22, 2016
White Plains, NY

SO ORDERED:

_____
Vincent L. Briccetti
United States District Judge

21